The next case on our docket is 24-40155, Stapleton v. Lozano. Ms. Alban? Thank you. Good morning, Your Honors, and may it please the Court. My name is Kelly Alban, and I represent the Appellant Defendant Officers Chief Solis and Officers Becetta and Lozano of the Progressive City Police Department. The appellant officers here asserted qualified immunity in response to the claims that they violated the decedent Joshua Stapleton's rights during his short time in custody in 2021 in this denied medical care case. This Court has repeatedly described qualified immunity as the norm that should not be denied except in rare circumstances, and this is not one of those rare circumstances. The trial court erred when it denied the officers' defense of qualified immunity, primarily because the plaintiff appellees did not point the court to a case on point, nor did the trial court seem to consider whether the conduct alleged in this case, that each individual officers were alleged to have engaged in, was prescribed by clearly established law. That's the real sort of omission in the underlying proceedings that I think requires this court to reverse. Instead, the trial court cited to the Twombly pleading standard and found only in its ruling denying the officers qualified immunity that they had plausibly alleged a 14th Amendment claim. And with respect to the trial court, that's just not enough. The unaddressed question and one of three questions before this court is whether the law is clearly established that an officer armed with the information that each individual officer had in this case, based on their pleadings, was required to seek medical care for Mr. Stapleton. And as this court has reiterated many times, including in Cunningham v. Castlew, the Supreme Court has instructed that this inquiry has to be undertaken in light of the specific context of the case and not as a broad general proposition, which is what it appears happened in the underlying proceedings. And this court tracing the Supreme Court standard has said this is a demanding burden for the plaintiffs at police to reach. Another question before the court is whether the specific facts even get to an underlying constitutional violation as to each individual defendant. Again, there's three defendants here up on appeal, the chief and then two subordinate officers who had different contact with Mr. Stapleton during his time in custody. And I'm going to walk through all of those in a moment. The final issue is whether the plaintiff's pleadings actually stated a claim against Chief Solis for failure to train. And if it did, again, did the court properly consider whether they had pleaded any other instances in which that had occurred before that could have supported their claim that the chief was deliberately indifferent to the threat that that could happen again. And I will note that in this case, even though it was decided on the Rule 12b-6, there was considerable information and factual details contained in the complaint, which included a copy of the police report in the underlying offense, recited from the autopsy report, and include 29 still photos that were taken from the jail's video monitoring system. And because those pieces of information were included in the First Amendment complaint and central to the plaintiff's claims, the officers attached those and submitted them with their motions to dismiss. Three things specifically, the full police report and two of the videos that were taken from the jail that captured Mr. Stapleton while he was there and some of the interactions with the officers. So that information was all before the court when it decided to deny the officers their qualified immunity. So I'll start with Chief Solis. What does the First Amendment complaint allege about his interactions with Mr. Stapleton? This is summarized in the Appelese brief in pages 29 to 30. But what they say is he's the chief of police in this small city of Progresso. He stopped at the scene of a traffic stop to assist one of his officers. He was there for a few minutes. He observed Mr. Stapleton, who likely appeared intoxicated. That happened about five hours before Mr. Stapleton was deceased. And the other factual allegation is that the arresting officer, not Chief Solis, had found some pills in two burnt pipes that were loose in the car that Mr. Stapleton was sharing with his companion, Mr. Guerrero, at the time. That's it. He showed up at the traffic stop, and the occupants appeared intoxicated, which they were arrested for, and the arresting officer found pills in the car. On those facts, they have asked the court to infer that Chief Solis could have known that Mr. Stapleton was at a substantial risk of serious harm and that he was going to experience the effects of fatal combined drug toxicity, which is what he ultimately died of. And the facts just don't get them there. That is dissimilar just by way of comparison from the Trevino v. Hines case, which was before this court in 2018. That was also a Rule 12b-6 case on appeal, and it involved an overdose at a traffic stop. And there the officers observed the detained person having symptoms like shaking, vomiting, rocking back and forth, kind of demonstrating these more significant symptoms. Here there's no allegations of that. There's no allegations that Chief Solis observed anything that could have made him believe, or that he actually did believe, that Mr. Stapleton was experiencing a drug overdose. And in the Trevino v. Hines case, with more to go on, this court said that it was doubtful that the plaintiffs had even alleged a constitutional violation. And here they don't even get to doubtful. Chief Solis simply did not commit a constitutional violation in leaving the traffic stop with his arresting officer there and observing nothing more than the occupants of the car intoxicated. But turning to the other component of this, and where, again, I think the real error was, there was no discussion about whether that conduct that was alleged about the chief has been clearly prescribed by a body of law from this court or the Supreme Court. They didn't point to any cases with similar conduct. The trial court didn't seem to consider that at all in making its decision. It really, the court just said that the 14th Amendment had plausibly been alleged. We disagree with that, but even if that had been the case, the plaintiffs still had the burden to take that to the next step and allege that the contours of the right was clearly established, and they were unable to do that. And as a result, Chief Solis was entitled to qualified immunity, and it was error for the court to deny that. Turning next to Officer Beceda, the First Amendment complaint alleges that his interactions with Mr. Stapleton included that he was simply assigned to be at the jail. He was on site at the jail when Mr. Stapleton was brought in. He didn't arrest him. He wasn't at the traffic stop. And then Mr. Beceda took Joshua Stapleton's temperature, and you can see in the still photos that were embedded in the complaint as well as the video that Mr. Stapleton appears cooperative with that. He's standing. He's approached the cell bars. He kind of has leaned in to have his temperature taken, and they don't allege that there was anything abnormal about that temperature reading. The next thing that happens with Officer Beceda is he walks by Mr. Stapleton's cell, and it appears he can see him sitting on the floor. Again, that's it. Those are the facts alleged that the plaintiff appellees have asked for the court to find constitutes a deliberate indifference to a substantial risk of serious harm, and the facts just don't support that. Again, he walked by the cell. He took his temperature, and he was at the jail when Mr. Stapleton was brought in. It's not a constitutional violation. But even if it were, as with Chief Solis, the plaintiff appellees had the burden to show the trial court, once qualified immunity had been asserted, that that particular conduct had been determined to be unlawful, a constitutional violation in some other circumstances. Do we know why he took his temperature? Is that routine, or was there some reason he suspected that he needed to get a temperature? Your Honor, I believe this was at sort of the tail end of COVID. Officer Beceda is seen wearing a face mask in the video, and I believe it was pursuant to those COVID protocols. So the constitutional violations there, they didn't assert any similar cases that would have put Officer Beceda on notice, that if you take somebody's temperature and you see them sitting on the floor when they've been brought in for intoxication, that to not seek medical care is a constitutional violation. So he, too, was entitled to qualified immunity. And that leaves Officer Lozano. He was the arresting officer. The facts allege that he pulled Mr. Stapleton and his companion over about 5.40 p.m. for swerving. He got them out of the car, attempted to do field sobriety tests, which they rejected. He did find some loose pills in the car, varying prescriptions, and two burnt pipes. But again, there's two people in the car. When he takes them in, ultimately they're arrested for public intoxication. When they get to the jail about an hour later, the plaintiffs allege that Mr. Stapleton told Officer Lozano he was not feeling well. Officer Lozano proceeded to take him back to the cell. He walked unassisted. The next still shot of Mr. Stapleton and Officer Lozano that's contained in the complaint reflects that when Officer Lozano walked by after bringing in two additional detainees who were arrested for other intoxication offenses unrelated to Mr. Stapleton, Mr. Stapleton is seen sitting upright and sort of facing in the direction of Officer Lozano. There's no indication that Officer Lozano even saw Mr. Stapleton when he was sort of bent over in the position that he ultimately was in when his companion, Mr. Guerrero, lifted him up and realized that there was something wrong, called for help. You can see on the video and in the stills he's calling for help and the women in the neighboring cells start climbing on the bars. And within seconds, seconds, Officer Lozano responded. And that didn't happen until about an hour and five minutes after Mr. Stapleton had sat down, was in the seated position that the plaintiff appellees demonstrated he was at a serious risk of harm. We think that Mr. Guerrero's presence in the cell demonstrates that even a layperson would not and did not recognize that Mr. Stapleton was experiencing an overdose. You can see in the still photos and the video that at times Mr. Guerrero approached Mr. Stapleton. He takes off his own shirt, puts it around his shoulders. He's touched him. He's down near his face. And at no time in that interaction did Mr. Guerrero seem to signal or indicate that he believed Mr. Stapleton was experiencing a drug overdose. That didn't happen until about five minutes before he alerted Officer Lozano, who responded immediately. And as with Chief Solis and Officer Becerra, even if that were a constitutional violation, there have been no cases presented to the district court or this court where there was a similar situation, that an officer had similar contact to that that Officer Lozano had here, where the court found that that was a constitutional violation. So they've not met the burden to show that the conduct here violates a clearly established right. And finally, with the failure to train, we submit that that was not really pleaded against Chief Solis. The First Amendment complaint pleads that really as a Monell claim against the city. The city obviously is not a party to this appeal, but it remains in the underlying case. Even if they had properly pleaded that, we did respond in our appellant brief on page 16, and we indicated, first, there's no underlying constitutional violation here as to any of the officers. Before we get there, Counsel, didn't the officers in their motion to dismiss the complaint state that the plaintiffs appeared to allege a failure to train claim against the chief? It was argued if they had. Again, the pleadings are unclear about who that was directed at. So the city responded to it in its motion to dismiss, and the officers responded to that to the extent it could be read as having been alleged against the individual officer. So it was raised in the motion to dismiss, yes. Didn't it actually state affirmatively that the plaintiffs appear to allege this claim rather than to the extent that they allege this claim? I think it may say that it appears. I can pull that and respond to that in rebuttal. But in any event, it still doesn't succeed against Chief Solis because the underlying constitutional violations are not there. None of the contact that they had would establish that, and there was no other cases that would have indicated this is a threat and something that they need to train to avoid. And if there are no other questions, I will sit down. Thank you. Good morning, Judge Richman, Judge Graves, Judge Ramirez. May it please the Court, my name is Kirk Cooper, and along with my co-counsel, Mr. Matthew Manning, we represent the plaintiff at police, the Stapletons. I will be addressing the Court for 15 minutes regarding the issues that are common to all the defendants. My co-counsel, Mr. Manning, will be addressing the Court for five minutes related to issues directed at Chief Solis. The question presented here is whether the Stapletons alleged sufficient factual matter to propel this case beyond 12b-6 and move this case into the discovery phase. They have. The District Court correctly denied Rule 12b-6 relief, and this Court should affirm for three reasons. First, the factual matter alleged here establishes deliberate indifference as to all defendants. After arresting Joshua Stapleton for intoxication-related offenses in a car filled with narcotics, some of which caused his death, Joshua Stapleton suffered a multi-drug overdose on the floor of the city of Progreso Jail, and the defendants did nothing for several hours. On the contrary, Officer Lozano told investigators that it was common practice if police got another call to leave inmates at the jail unattended, and they received another call that night. This lack of inmate supervision, coupled with the lack of timely intervention, resulted in a predictable, preventable tragedy in this case. Second, Chief Solis is additionally liable as a supervisor for failure to train. The matter of failure to train, as Judge Ramirez correctly pointed out, was before the District Court. The appellants did not assign that as a ground for error in their opening brief. As such, it is waived, and this Court must affirm the District Court's decision as to that ground. Even if the Court could address this issue, the allegations make clear that Chief Solis enacted a policy of leaving inmates unattended at the jail, which raises an issue as to whether he promulgated a policy or otherwise failed to train his underlings. Third, the alleged constitutional right violated here is clearly established. The appellants did not raise the clear establishment issue in their opening brief. They only raised it in their reply brief. Issues that are raised in a reply brief are not proper basis for reversal, and as such, this point has also been waived. But even if not, other cases clearly establish the medical indifference standard, and the medical indifference standard here was properly applied. Now, turning to the specific facts of this case, the medical indifference standard, or deliberate indifference, requires several things. It requires a prison official to refuse to treat an inmate, ignore his complaints, intentionally treat him incorrectly, or engage in some sort of similar conduct that would clearly evince a wanton disregard for a serious medical need. Here we contend that that standard has been established based on the fact that, one, the prisoners were left unattended for several periods of time, and two, there were facts indicating to all the officers that Mr. Stapleton was a substantial risk of overdose. When he was pulled over, he was pulled over for intoxication-related offenses. The legal definition of intoxication, obviously, is you are in a state where your mental and physical faculties are not with you by virtue of the introduction of alcohol or some other intoxicating substance. Various narcotics were found in the car during an inventory search, and when Mr. Stapleton and his companion were brought to the jail, Mr. Stapleton was unsteady on his feet. He told the officers he was not feeling well. We allege that he had some sort of black substance on his fingers, and it's apparent from the stills in the video that he was in medical distress for quite a while. At some point, he slumps over into a sort of fetal position. You can see this in the pictures. And then when he is finally wheeled out after the officers check on him, approximately four and a half to five hours after he originally came into custody, you can see in the picture that he's already sort of got this blue-purple tinge on his face, which seems to suggest lack of oxygen for at least some time. Additionally, we referred the court to the Texas Commission on Jail Standards Conduct, which say that It's your position that he had accidentally overdosed and that he had ingested all these drugs before they arrested him. We believe that to be the case, yes. We believe that he was intoxicated at the time that he was pulled over. And so turning back to the issue of the Texas Commission on Jail Standards Conduct, those TCJS standards require jailers to monitor inmates at least once an hour. We contend that those standards inform the inquiry here. Even if we take the facts in the light most favorable to the officers, which obviously under the standard of review we don't, he was unattended for at least 71 minutes after he assumed a fetal position. And so under the— Help me understand. So he had already ingested the drugs that ultimately ended up causing his death? That's correct. That's your—  So they should have made a determination at the time they arrested him that he's potentially overdosed. They should have made that determination at the time of the arrest, or they should have observed him during the course of his incarceration, well, of his being detained. They should have observed him and made that determination during this period where they should have been observing him. Which one is it? Sure. So our position is based on the facts as they were at the time of the arrest. We believe that the officers should have recognized that there was a potential for an overdose risk given that he'd been picked up on an intoxication charge, given the fact that he had told the police he was not feeling well, given the fact that they found hydrocodone and other narcotics in the car. And so that should have triggered a heightened duty to continue monitoring his condition to assure that he didn't further deteriorate. You said they should have known from the fact that he was in the fetal position. How do you define fetal position? Well, in the video you can sort of see our contention is he is leaned over, he's slumped over, kind of face down, and he remains face down in that position for approximately 71 minutes. There's other times in the video where you can't really see what's going on because he's not directly on camera. But for those final 71 minutes, it's obvious that he was in medical distress. And we also contend, again, based on the fact that he's got this blue-purple tinge, we believe that he had been deprived of oxygen for some time. By the point that his companion holds him up by his arms and sees that he's kind of slumped over, we believe that he had already been in this overdose situation for a while and that regular monitoring could have possibly caught that at a point where intervention would have helped. Wasn't he, in fact, sitting on the floor upright on his shins and ankles with his head down? It's hard to see from the video. I can see sort of what you're saying. That position is a little unclear to me. It looks a little bit more like fetal position where he is kind of slumped over. And that's another reason why we need discovery on this is to figure out the actual position that he was in. He wasn't laying on his side on the floor with his knees curled up in his chest? Not on his side, no. He was sort of face down. He wasn't face down on the floor. He had his head down, didn't he? He was sitting upright with his head down. So to me, it looked like he was sort of leaned over his legs. But we believe that the position he was in would have suggested that he was in distress. I mean, at some point, his companion comes over and puts a shirt on him as he's sort of leaned down. It looks to me like he's facing the floor, but he's sort of slumped over. But he's able to hold himself up, in other words. He's not just flat out on the floor. It's hard to tell from the video. I think we would need, again, more discovery to really determine what the position was. But we believe that at that point in the video where we can call it maybe he's face down, maybe he's sort of slumped over, we believe at that point there is obvious distress that can be seen from the video. Let's talk about the failure to train claim, or is this something that Mr. Manning will address? Mr. Manning can address it, but if you have a question, I'd be happy to address it as well. You mentioned it. I just wanted to be sure I asked my questions of the correct person. Yes, sure thing. Thank you. Thank you. And so I want to go through a little bit in the time that I have left some of the cases cited by the officers. For example, the officers rely on the Thompson v. Upshur County case. That case did involve qualified immunity in the summary judgment context. Obviously, we're here in 12 v. 6. And in Thompson, qualified immunity was granted, but it was granted because the particular claim there was not clearly established. The claim in that case was someone had been brought in on alcohol. They were suffering from delirium tremens. And the specific claim there was even though the detainee had affirmatively refused medical treatment, they should have treated him over his objections, this court said, no, that's not clearly established law. We're not going to hold anyone liable. But there were a lot of interesting caveats that this court made. This court recognized that failure to train is viable. This court recognized that intoxication and delirium tremens are significant risk factors. So even if you're dealing with someone who is picked up on a DWI and may only be alcohol intoxicated, there still is a duty to monitor that person by virtue of the fact that even alcohol intoxication can present significant risks. As for the Rogers v. Jarrett case that the officers cite as evidence that were, excuse me, as establishing the standard that it must be obvious to a reasonable layperson, Rogers is distinguishable. Again, I believe Rogers is a motion for summary judgment case. But in Rogers, the inmate had been working in a barn that collapsed on him. The only apparent injury he suffered was a scrape to the knee. And so at that point, they didn't believe there was any need for additional monitoring, and they sent him back. Later on, his head began swelling, vomiting, seizures, and at that point they had intervened. This case is different. Again, he told the police he was not feeling well. They found him with drugs. There's a distinction between this case and other drug cases where police were not necessarily aware of the possibility of ingestation. You know, there are some cases where someone has taken, for example, a baggie of cocaine that ruptures inside, and the police have no idea that they've consumed any drugs. Here, the distinguishing factor is intoxication arrest, plus drugs on the scene, plus admission of not feeling well, plus all the other factors that we've sort of laid out. With that, unless the court has any further questions, I would yield the floor and the remainder of my time to my co-counsel, Mr. Manning. Did they ask him how much drugs he had ingested or smoked or however he got high? Sure. Did they ask him that question? We don't know. We have not had the benefit of discovery yet. Right now we're at 12B6, so we're unsure as to- Is it your view that they should have asked him that question? Yes. In other cases where this court has found qualified immunity attaches, they do ask, have you consumed drugs? And in those cases, the detainees have consumed drugs, but they'll deny it to the police. And so that is part of the inquiry, asking whether or not they've taken drugs. Here, we don't know because we haven't had the benefit of discovery. But we contend that that is something that they should have included as part of the inquiry. And if he said yes, then what's the standard of care? Well, if he says yes, our contention is the standard of care is there needs to be a medical evaluation, and there also needs to be additional monitoring to make sure that he is having his basic medical needs met. Now, you said you haven't done any discovery. Wasn't there someone with him in the car? Yes, Your Honor. They don't know whether or not he was asked? That I'm not- Talk to that person. Right. We can speak to that person. I personally have no knowledge as to what that person has said. But we can, we could ask. Nobody's prevented you from asking that question. No, Your Honor. Before you file your complaint. No, Your Honor. All right. All right. And so if there are no further questions, we would respectfully request that this court affirm the 12B6 dismissal order. And now I cede the floor to Mr. Manning. Thank you very much. May it please the Court. Good morning, Your Honors. My name is Matt Manning. I'm obviously Mr. Cooper's co-counsel. I want to speak to something directly that I think is kind of indispensable with this case that has not been addressed yet, and that's reframing that the crux of the constitutional argument here was really what this court said in domino, that this is a functional refusal to treat Mr. Stapleton at all. And the basis of that refusal is the fact that there was nobody at the jail. What happens after this occurs is Mr. Lozano speaks to the Hidalgo County Sheriff's Department. They come in. He comes in with an attorney. They ask him a litany of questions about what happened. And he says unequivocally multiple times, that's just essentially what we do. If we get a call, we leave the station. So the crux of this case is really less whether they provided the medical care upon a recognition of him needing medical care. It's the fact that there was no one there to ascertain that he needed medical care. If you look at the Texas Penal Code, by way of analogy, we criminalize abandonment and neglect of children under the basis that they're under their parents' aegis, and if their parents don't provide what they need, then that's a criminal offense. This is obviously not that. How often was he observed while he was incarcerated? As far as we can tell, Your Honor, only one time with the instance of the temperature check when Officer Becerra came by. Now, we can't speak directly to how many times incidentally someone may have seen them when they dropped the women off in the adjacent cell. But part of the crux of our allegation is that there was no consistent monitoring. Nobody came by for over an hour in at least one instance. And the reason that's important is one of the cases in our briefing is a case from the Eastern District of Louisiana, I think it's Nagel v. Guzman, where the court found that a jailer leaving his post three times was constitutionally violative. Now, that was a little dissimilar insofar as that jailer actually pled guilty to a companion criminal felony offense. But the logic is applicable here exactly as it's been pled. All three of the individual defendants at some point were not at the location. And the crux of it is that is a functional refusal under this court's precedent with Domino, in Domino, if you're not on site to even determine if somebody needs medical care. And the reason that's important is under the 14th Amendment, once you're in custody, the jail or the custodial authority has the duty to provide your serious medical needs. Do they have a duty to sit back there with them and keep eyes on them at all times? Or do they have a duty to do rounds every 30 minutes, every 15 minutes? What is the duty? So that's the thorny issue here, Your Honor. This city is so small that the jail standards don't apply to them directly. It applies to larger cities. The way we've alleged it, however, is you can use those jail standards as a rubric to say what should have been the standard of care. And our position is somebody should have come by at least within an hour's time. Somebody does not come by for 71 minutes as is directly pled, and we say that that's a violation of his constitutional rights under the 14th Amendment. And to that end, Judge Ramirez, you asked about whether he was in fetal position. I think the more appropriate framing is that he was folded over himself. So he was sitting down. There was a point where he was sitting upright. But throughout the course of that time, there was a constant kind of declining, and then at some point he was folded over until he expired or until the point that the jailers came in. So he wasn't in a true fetal position, but he was very obviously in an incapacitated position. Would that position also be consistent with someone who is intoxicated but not in distress? Perhaps, Your Honor. The issue, though, here is not only did he say that he was in distress at the point that he was put into the jail, but a reasonable inference can be drawn that he may be in distress from the drugs that were found with him. And that's kind of the crux of this here. It's not ñ I apologize, Your Honor. I do have a question because your time is running out about the failure to train. Clearly a Monell claim was asserted against the city. Who would be responsible for the training in the claim against the city? It would be Chief Solis because ñ I apologize. So where in the First Amendment complaint is the failure to train claim asserted specifically against Chief Solis in his individual capacity? If I remember correctly, it was actually in there twice, Your Honor. It's in there as a failure to train or supervise. So the claim actually subsumes the supervision. And if I can direct the Court's attention, I can tell you very quickly. Thank you. It is at record page 71, paragraph 19. And page 94, paragraph 86. When the individual defendants asserted in their motion to dismiss that the plaintiffs appeared to assert a failure to train claim against the chief in his individual capacity, where in the response did the plaintiffs agree that they had? I don't want to be dishonest. I can't recall where we set that, Judge. All right. Thank you. I know it was in the First Amendment complaint, but I'm not sure in the response where that is. All right. Thank you. I have a question about Tamir's v. Manthe. Are you familiar with that case, counsel? I'm not, Your Honor. I apologize. If the Court would give me a distillation, I can say how it may be similar or dissimilar, but I'm not aware of the fact stretch. What about you? You're familiar with that case? Yes, Your Honor. This may be a little bit irregular, but I sure do want to hear how you're going to tell me that one's much different from this one. So thank you, counsel. Thank you, Your Honor.  So the Tamez case, I believe, is one of the cocaine or methamphetamine ingestion cases. Is that correct? Yes. So if I'm remembering Tamez correctly, Tamez involved the detainee who was taken into police custody, and she had ingested methamphetamine surreptitiously while she was in custody and the police were unaware that she had done so? Am I remembering that correctly, Your Honor? Yes. Okay. She revealed that she felt tired, which is kind of what we have here, where he said he didn't feel well. She had dilated pupils, which would have been some indication that something was wrong. And so here they had some indication that something was wrong. But still in that case we said not enough there, there's deliberate indifference. And that's why I'm trying to figure out how that's very much different from what we have here. So Tamez is different. I believe in Tamez the overdose situation happened rather quickly while she was in the back of a police car. But even taking a step back, there was a question as to whether or not the police were aware that she had the drugs on her in the first place. And also the distinguishing factor here is that— We have a question of whether or not they were aware of whether drugs, I mean how much drugs had been ingested. Sure. Yes. And so I would say another distinguishing factor would be the length of custody. Here we have a much longer length of custody. We have transport all the way back to the— But in Manthe the death occurred the next day, didn't it? Wasn't it the next day? I believe that's correct. I think the distinguishing factor that we would point to here is I don't believe there was a question in Tamez as to whether or not there had been adequate monitoring. We have alleged here the distinguishing factor being there should have been adequate monitoring. There should have been additional medical provision. And there should have been monitoring at least once an hour. So I don't believe that was addressed in Tamez. And so I think that's what made this case distinguishable. All right. Thank you, counsel. Thank you. Judge Graves, you are right that the death in Tamez occurred the next day after the person had been in custody overnight. And I think that it's not distinguishable. What they're alleging here is that these officers, based on their limited—individually their limited contacts, each of them should have independently known somehow that Mr. Stapleton was going to experience this overdose. And I'll point out to you that this is a little bit different from Sanchez v. Young where there were drugs found in— or there was a person found in their car, but it was blister packs that were empty in that case that indicated to the officers that the person had actually ingested the drugs. Here they didn't allege that the officers knew or were told that Mr. Stapleton had consumed those drugs. And, in fact, the fact that the officers found the pills and not empty packages or empty bottles suggests the contrary, absent some other indication that he had ingested them. So I'd like to address a couple other things that my opponents brought up. One, whether or not this was clearly established was an issue raised by the individual officers before the trial court. It's also asserted in our appellant brief. In fact, it's a couple in two different headings. It says that they have not alleged this—they've not met the deliberate indifference standard, and they have not shown that the right was clearly established. And, again, here I don't think we heard anything new. There were no cases brought to the attention of this court where it would have put Chief Solis on notice that if you go to a traffic scene to assist an officer, you see somebody intoxicated, and you leave without calling for medical care, you've violated the law. That case doesn't exist as far as I can tell. And certainly the plaintiffs have not—appellees have not met their burden to put that before this court to show that it was clearly established. I think their main allegation as to Chief Solis is the failure to train and the policies that were in place at the jail. Well, they have certainly alleged that individually he was deliberately indifferent to a serious risk of medical care as to Joshua Stapleton. So I think they have attempted to bring two claims against Chief Solis. One is that because he was at the traffic scene and because his subordinate found pills in the car, he should have known that Mr. Stapleton was going to experience this overdose, and he didn't seek medical care for him. And then with the failure to train, Judge Ramirez, you are correct. I think what we put in our 12b-6 was that they appear to avere that there was a failure to train claim against Chief Solis, which was, again, addressed in the city's Rule 12. We don't think that was really developed before the court, but it was in there. So I think to answer your question, Judge Richman, they have brought an individual—a claim against Chief Solis individual for the deliberate indifference, in addition perhaps to the failure to train. And in terms of the observation, one other thing I would like to note, they claim that he was not observed at all for periods of time. What we know from their pleadings, and this is contained in the First Amendment complaint, is that the jail had a closed-circuit television monitoring system. That's how pre-litigation they were able to obtain the videos that they used to put the stills, photos in the complaint, and that that video was being monitored. And in fact, you can see in the stills and then again in the full video that was attached to the officer's Rule 12 motion, as soon as one of the female detainees who's in the neighboring cell, she turns and waves at the camera. And Officer Lozano is there within seconds, which again indicates that he was observing, albeit not face-to-face. Who was monitoring and were they on the premises at all times? I'm sorry, what was the first part? You said the video was being monitored. Who was monitoring and were they on the premises at all times? Your Honor, we do not believe that all of the officers were on scene at all times. What the plaintiffs alleged was that in his interview with the Texas Rangers, Officer Lozano said that the EMTs and fire departments share the station and they occasionally will monitor. In all likeliness, there were periods of time because of this other call that was answered where the officers themselves were not watching the video. Is there evidence that somebody was watching the video at all times or not? That's not in this record and I don't think that point has been developed yet, Your Honor. Did they allege that it was not watched all the time? They have alleged that the face-to-face observations were not made and I don't know that they have alleged that specifically. I think they allege that nobody walked by the cell for 71 minutes. But they don't say anything about the monitoring? Not specifically. I think what they know of that is what they were able to obtain from Officer Lozano's interview after the in-custody death. I see that my time is up. Thank you.